IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

MICHAEL JOHNSON                                                                  PLAINTIFF

v.                                   NO. 3:15-cv-00220 PSH

CAROLYN W. COLVIN, Acting Commissioner                                DEFENDANT
of the Social Security Administration

### MEMORANDUM OPINION AND ORDER

Plaintiff Michael Johnson ("Johnson") commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Johnson maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Johnson first maintains that the ALJ committed error at step three of the sequential evaluation process. Johnson maintains that his intellectual impairment meets Listing 12.05C, and the ALJ erred when he failed to so find.

At step three, the ALJ must determine whether a claimant's impairment, when

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

considered individually and in combination with his other impairments, meets or equals a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is a medical one, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden of showing that his impairment meets or equals a listed impairment, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998).

Listing 12.05 addresses intellectual disability, formerly referred to as mental retardation. The introductory paragraph of Listing 12.05 explains that the disability encompasses "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," that is, the evidence demonstrates or supports onset of the impairment before the claimant's twenty-second birthday. A claimant meets or equals Listing 12.05 by satisfying the requirements of the introductory paragraph and one of four paragraphs contained in the listing. Paragraph C, or 12.05C, requires proof of a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The formal diagnosis of an intellectual disability is not required. The ALJ is not obligated, though, to accept a claimant's IQ scores and may reject scores that are inconsistent with the record. See Clark v. Apfel, 141 F.3d 1253 (8th Cir. 1998). "Indeed test results of this sort should be examined to assure consistency with daily activities and behavior." See Id. at 1255 [internal quotations and citation omitted].

The evidence relevant to Johnson's intellectual abilities reflects that in June of

2011, he was seen by Dr. Kenneth Hobby, Ph.D., ("Hobby") for an intellectual and mental diagnostic evaluation. See Transcript at 487-502. Johnson reported, inter alia, that he attended school through the sixth grade and earned primarily Cs and Ds. He also reported having been fired from a job once because of an inability to read. Hobby administered Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") testing, and the results indicated that Johnson has a verbal IQ of seventy-one, a performance IQ of seventy-four, and a full scale IQ of sixty-nine. Hobby observed, though, that "[t]he test scores seem[ed] to be a little bit low indication of [Johnson's] current functioning ..." See Transcript at 496. With respect to the effects of Johnson's impairment on his adaptive functioning, Hobby found the following:

> 1. **How do mental impairments interfere with this person's day to day adaptive functioning?** ...
>
> [Johnson] reported being able to drive a car on familiar roads and he has a license. He said he could drive on unfamiliar routes, but he tries not to. He said he can drive alone for distances up to 20 miles from home. He reports the following problems with being able to shop adequately for groceries, clothing, and personal items: None. He reports the following problems with being able to use a checkbook to pay bills: he can't write one. He reports the following problems with being able to make change and purchase things at the store with cash: None. He reports that he participates in the following social groups: Immediate family, church. On a typical day he gets up at 7-8 a.m. During the day he watches TV, helps his father, works on cars, and helps out around the yard. In regard to [activities of daily living], his reported MENTAL impairment DOES NOT appear to significantly impact an independent level of feeding himself, bathing, self-care, personal hygiene, and dressing.
>
> 2. **Capacity to communicate and interact in a socially adequate manner?** ...

[Johnson] reports getting along with his parents. He reports not getting along well with his siblings. He reports not associating with neighbors. In school, poor relationships were reported with his teachers and his schoolmates. He reported poor relationships with his childhood playmates.

Only slight limitations were noted in [Johnson's] current capacity to communicate and interact in a socially adequate manner because he is introverted. There were no discrepancies between alleged inadequacies and the interpersonal skill level demonstrated during the interview.

3. **Capacity to communicate in an intelligible and effective manner?**

[Johnson's] grammar was adequate for communicating information on at least a basic work-like task. [He] did not seem to have any difficulty understanding instructions given by the examiner. There seemed to be level of understanding that would enable [Johnson] to respond to very basic normal instructions.

4. **Capacity to cope with the typical mental/cognitive demands of basic work-like tasks?**

[Johnson] has slight limitations in the ability to understand, carry out and remember basic work-like tasks. [He] would probably respond adequately to work pressure in a work-like setting if he was motivated, could do the work, and the work wasn't timed.

5. **Ability to attend and sustain concentration on basic tasks?**

Slight limitations were observed in [Johnson's] ability to attend and sustain concentration on basic work-like tasks.

6. **Capacity to sustain persistence in completing tasks?**

[Johnson] seemed … able to persist at the tasks during the interview. He should be able to mentally persist on appropriate skill level work-like tasks for an 8 hour day if he was motivated, could do the work, and the work wasn't timed.

7. **Capacity to complete work-like tasks within an acceptable time frame?**

> The pace at which [Johnson] worked was slower than normal and steady and appropriate for completing basic work-like tasks if he didn't have to adhere to strict time limits.

See Transcript at 497-498. Hobby diagnosed Johnson with a learning disorder and borderline intellectual functioning accompanied by dependent personality traits.

Dr. Sheri Simon, Ph.D., ("Simon") reviewed Johnson's medical records. See Transcript at 507-510. Simon opined that Johnson does not have marked limitations in adaptive functioning and is capable of performing simple, routine, repetitive tasks. Simon opined that Johnson can perform work where "interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; [and] supervision required is simple, direct, and concrete (unskilled)." See Transcript at 509. Simon's opinions were later affirmed by Dr. Susan Daugherty, Ph.D., ("Daugherty"). See Transcript at 557.

Johnson represented in his disability documents that he is capable of spending time with others, although it typically involves merely watching television or sitting outside. See Transcript at 271. He denied having any problems getting along with family, friends, or neighbors. See Transcript at 272. He represented that he cannot pay attention for very long, is not good at following written instructions, is "okay" with following spoken instructions, does not get along well with authority figures, and does not handle stress or changes in his routine well. See Transcript at 272-273.

Johnson testified during the administrative hearing about his intellectual

disability. See Transcript at 53-69. He testified that he can read "some" and write "all right" but has difficulty spelling. See Transcript at 54. He can add and subtract but requires a calculator to do so. When asked why he cannot work, he reported, in part, that he has difficulty getting along with some people and has trouble taking directions. Johnson takes medication for anxiety, but the medication makes him sleepy. A typical day consists primarily of seeing his children to and from school and resting at the home he shares with one of his parents. Johnson has no close friends, rarely socializes, and occasionally attends church.

The ALJ found at step two that Johnson's severe impairments include a learning disorder and borderline intellectual functioning. At step three, the ALJ found that the impairments do not meet or equal a listed impairment. The ALJ acknowledged that WAIS-III testing indicated that Johnson has a full scale IQ of sixty-nine. The ALJ found, though, that the score is not a true reflection of Johnson's adaptive functioning, and the ALJ discounted the score.[2] The ALJ then assessed Johnson's residual functional capacity and, in doing so, gave significant weight to the findings made by Hobby. The ALJ also gave "significant evidentiary weight" to the findings of Simon, whose findings were affirmed by Daugherty. See Transcript at 20. The ALJ found that Johnson can perform light work but with the following non-exertional limitations:

> … work is limited so that interpersonal contact is incidental to the work

---

[2] There is no dispute that Johnson's intellectual disability manifested before his twenty-second birthday and that he has other impairments imposing additional and significant work-related limitations.

performed; the complexity of 1-2 step tasks can be learned and performed by rote with few variables and little judgment; supervision required is simple, direct, and concrete for the worker; SVP 1-2 level jobs that can be learned within 30 days; work limited to reasoning levels 1-2; work does not require excellent reading and writing skills; work not to require more than occasional changes to the workplace setting.

See Transcript at 15.

Substantial evidence on the record as a whole supports the ALJ's finding at step three. Specifically, the ALJ could and did find that the results obtained from WAIS-III testing are not a true reflection of Johnson's adaptive functioning and the scores could therefore be discounted. Instead, the ALJ could and did find that Johnson's intellectual disabilities are not so severe as to prevent him for performing all work-like tasks. The Court so finds for four reasons.

First, the results of WAIS-III testing are the product of Hobby's first and only evaluation of Johnson. "A one-time evaluation by a non-treating psychologist is not entitled to controlling weight." See Clark v. Apfel, 141 F.3d at 1256 [citing Loving v. Department of Health and Human Services, 16 F.3d 967, 971 (8th Cir. 1994)].

Second, notwithstanding the foregoing, Hobby questioned the results of WAIS-III testing. Hobby recognized that Johnson scored poorly but observed that, given his "adaptive behavior, work history, and background information," see Transcript at 495, the results are not a true indication of his functioning. Hobby instead believed that Johnson is performing in the borderline intellectual functioning range.

Third, the results of WAIS-III testing are inconsistent with the adaptive functioning

findings made by Hobby, Simon, and Daugherty. For instance, Hobby observed that although Johnson has some limitations in his ability to understand, carry out, and remember basic work-like tasks, Johnson would "probably respond adequately to work pressure in a work-like setting if he was motivated, could do the work, and the work wasn't timed." Simon, like Hobby, opined that Johnson has some limitations. Simon, though, opined that the evidence does not support marked impairment in Johnson's adaptive functioning, and Daugherty affirmed Simon's opinion.

Fourth, Johnson's self-reports and testimony undermine the validity of WAIS-III testing. He reported few limitations caused by an intellectual disability. Specifically, he testified that he can read "some" and write "all right" but has difficulty spelling. He can add and subtract but requires a calculator to do so. He is capable of spending time with others and can attend to his personal care.

Given the foregoing, the ALJ could and did find that Johnson does not have a valid full scale IQ of 60 through 70. The ALJ could and did therefore find that Johnson's intellectual disability does not meet or equal Listing 12.05C.

Johnson offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Johnson maintains that the assessment of his residual functional capacity was erroneous because his "chronic back pain keeps him from engaging in the prolonged walking and standing necessary to perform light work." See Document 11 at CM/ECF 16.

The ALJ is required to assess the claimant's residual functional capacity, which is

a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of assessing the claimant's residual functional capacity, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

The medical evidence relevant to Johnson's ability to walk and stand reflects that in March of 2010, he was seen for a health classification and restriction evaluation upon entering the custody of the Arkansas Department of Correction ("ADC"). See Transcript at 430-440. His past surgical history was recorded and included surgery in 2006 to remove a tumor from his spinal cord.[3] Abnormalities were noted in his back, and the attending medical professional made the following observations: "[l]imited [range of motion] with forward bending," "[o]nly able to bend 30 degrees," and "[u]nable to perform squat/walk or heel/toe ambulation." See Transcript at 433.

Johnson sought medical attention for back pain on several occasions during his

---

[3] Johnson testified during the administrative hearing that he had a period of paralysis following the surgery, but he eventually regained the ability to walk. See Transcript at 55-56.

incarceration. See Transcript at 460 (03/31/2010), 461 (04/02/2010), 448-449 (04/16/2010), 446 (04/20/2010), 458-459 (05/04/2010), 454 (05/29/2010), 450-451 (11/09/2010). The progress notes reflect, inter alia, that he had a slow gait and a limited range of motion. He was placed on restrictions, i.e., he was excused from work for a period of time and instructed not to participate in sports or yard call, and prescribed medication.

In June of 2010, Johnson was seen for a review of his health classification. See Transcript at 430-431, 452. He was observed to have a "large midline surgical scar back thoracic" and was capable of flexing thirty degrees. See Transcript at 430. His limitations were such that he was restricted from work assignments that required the following: "prolonged crawling, stooping, running, jumping, walking, or standing;" "strenuous physical activity for periods in excess of [four] hours;" and "handling [and] lifting heavy materials in excess of [ten pounds] or requiring overhead work for a period in excess of [two] hours." See Transcript at 430.

After Johnson was released from the custody of the ADC, he presented to an ARCare clinic in September of 2011 to establish care and be seen for his chronic back pain. See Transcript at 529-530. Dr. Henry Allen, M.D., ("Allen") observed that Johnson had a normal range of motion in his spine and no limb abnormalities. Allen diagnosed Johnson with back pain and prescribed mediation. Allen also referred Johnson to St. Bernards Medical Center for a CT scan.

In September of 2011, a CT scan of Johnson's back was performed at St. Bernards

Medical Center. See Transcript at 543-549. The scan of his cervical spine revealed "[l]eft uncovertebral joint hypertrophy at C6-C7 result[ing] in mild left neuroforaminal narrowing" and some straightening of that portion of his spine. See Transcript at 545. The scan of his thoracic spine revealed "no acute fracture or malalignment" of that portion of his spine. See Transcript at 546. The scan of his lumbar spine revealed a "[s]mall disc bulge at L4-L5" with chronic osteophytosis but otherwise no severe nerve root compression or severe stenosis was observed. See Transcript at 548.

In October of 2011, Johnson presented to a hospital emergency room complaining of back pain brought about when he attempted to lift a couch. See Transcript at 535-542. He reported that the pain radiated down his right leg and up into his neck. An examination indicated that he had a full range of motion, and a CT scan of his thoracic spine revealed no acute abnormalities. A CT scan of his lumbar spine revealed, though, "[d]egenerative disc with broadly bulging annulus at L4-L5 and mild central canal stenosis," see Transcript at 541. There was no frank exiting nerve compromise. Id. Johnson was diagnosed with thoracic back pain and low back pain and prescribed medication.

The medical record is silent until August of 2013 when Johnson presented to Dr. Clarence Kemp, M.D., ("Kemp") to establish care and be seen for chronic back pain. See Transcript at 565-566. Kemp's progress notes are unremarkable. He noted, inter alia, that Johnson appeared to have normal strength in both legs. Kemp diagnosed back pain and prescribed medication.

Johnson saw Kemp on at least five subsequent occasions for chronic back pain. See Transcript at 562-564 (09/25/2013), 559-561 (11/19/2013), 586-587 (02/12/2014), 583-585 (06/06/2014), 574-576 (09/23/2014). At the February 2014 visit, Johnson reported difficulty walking due to back pain and the onset of colder weather. By June of that year, though, he reported being able to walk a mile a day with his children. Kemp repeatedly noted tenderness in Johnson's back and prescribed medication.

Dr. Karmen Hopkins, M.D., ("Hopkins") reviewed Johnson's medical records. See Transcript at 479-486. Hopkins opined that Johnson is capable of performing light work with postural limitations. Hopkins' opinion was later affirmed by Dr. Bill Payne, M.D., ("Payne"). See Transcript at 550.

The non-medical evidence relevant to Johnson's ability to walk and stand is contained, in part, in a pain form, function reports, and a work history report. See Transcript at 227, 229 (pain form), 232-239, 267-274 (function reports), 219-226 (work history report). In the pain form, he represented that he experiences constant pain in his back and right leg. He represented that he can walk only about fifty feet before experiencing pain, can stand for only about twenty to thirty minutes before experiencing pain, and can only sit for about twenty to thirty minutes before experiencing pain.

In the function reports, Johnson represented that a typical day consists primarily of seeing his children to and from school and resting at the home he shares with one of his parents. Johnson can attend to his personal care but cannot prepare any meals, can do no house or yard work, and his hobbies are limited to reading magazines.

In the work history report, Johnson listed no past employment. The summary of his FICA earnings reflects that he has never had any substantial gainful activity; in fact, the summary reflects that between 1976 and 2012, he only once earned more than a thousand dollars in a year. See Transcript at 201.[4]

Johnson testified during the administrative hearing, and his testimony largely conformed to the representations made in his disability documents. See Transcript at 53-69. He testified that he was born on October 22, 1976, and is five feet, ten inches tall and weighs 270 pounds. He attributed his inability to work to, inter alia, the pain he experiences in his back. Medication helps ease his pain, and he occasionally wears a brace on his back.

The ALJ found at step two that Johnson's severe impairments include "remote spinal tumor removal, back pain, [and] obesity." See Transcript at 12. The ALJ assessed Johnson's residual functional capacity and found that he can perform light work but with the following exertional limitations: "no climbing ladders, ropes, scaffolds; not more than occasional performance of each remaining postural function; no exposure to unprotected heights and hazards in the workplace." See Transcript at 15. In making the finding, the ALJ gave "significant evidentiary weight" to the opinions offered by Hopkins, and affirmed by Payne, because the medical professionals "thoroughly evaluated the objective medical evidence ..." See Transcript at 19.

---

[4]

Johnson represents that he previously received disability benefits. The benefits were terminated when he was incarcerated.

Substantial evidence on the record as a whole supports the ALJ's assessment of Johnson's residual functional capacity. Specifically, the ALJ could and did find that Johnson is capable of performing the walking and standing requirements of light work, albeit with some additional exertional limitations.[5] The Court so finds for three reasons.

First, the medical evidence indicates that Johnson's back impairment improved over time. As the ALJ could and did find, Johnson showed continual improvement since the tumor on his spine was removed. For instance, when Johnson was seen for an ADC health classification and restriction evaluation in March of 2010, abnormalities were noted in his back, he had a limited range of motion with forward bending, he could only bend thirty degrees, and he was unable to squat/walk or heel/toe ambulation. By the time Johnson saw Allen in September of 2011, though, Johnson had a normal range of motion in his spine and no limb abnormalities. Allen's observations are consistent with those made by Kemp, who saw Johnson from August of 2013 through at least September of 2014. For instance, Kemp observed that Johnson appeared to have normal strength in both legs. It is true that CT scans revealed that Johnson had some disc bulging and mild central canal stenosis at L4-L5 and some joint hypertrophy at C6-C7. The ALJ could and did credit those test results and limit Johnson to light work with some additional exertional limitations.

---

[5] Light work involves, inter alia, a good deal of walking and standing most of the time. See 20 C.F.R. 404.1567(b). In Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995), the Court of Appeals observed that "[l]ight work requires that a claimant be capable of [walking or standing] for a total of six hours out of an eight-hour workday."

Second, the opinions of the state agency physicians are consistent with the assessment of Johnson's residual functional capacity. Although Hopkins' opinion, which Payne affirmed, is not entitled to great weight, the opinion is entitled to some weight. See Mabry v. Colvin, 2016 WL 827183 (8th Cir. March 3, 2016) (ALJ may rely, in part, on opinion of state agency physician). There is no evidence the ALJ gave the opinion inappropriate weight, and he did not err in relying, in part, on the opinion.

Third, the non-medical evidence is capable of more than one acceptable interpretation, and the ALJ's interpretation is one of the acceptable interpretations.[6] As the ALJ could and did find, Johnson experiences some back pain but not to the degree he alleges. The ALJ considered the medical evidence in so finding, and his consideration of it was not improper. He could and did find that the medical evidence does not support Johnson's complaint of disabling back pain. The ALJ also considered Johnson's daily activities. Although Johnson testified that he does very little during a typical day, the record does not support such a severe limitation of his daily activities. The ALJ also considered Johnson's use of medication, and it appears to have been routine and/or conservative during recent times. Although the ALJ gave little mention to the remaining Polaski v. Heckler factors, he did not commit reversible error in doing so. The evidence relevant to those factors is minimal and does not support Johnson's assertion of disabling

---

[6] It is true that the ALJ did not specifically cite Polaski v. Heckler, but his failure to do so is not reversible error. The ALJ is not required to cite or even "explicitly discuss" each Polaski v. Heckler factor. See Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). "It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." See Id.

pain.

Johnson faults the ALJ for failing to obtain an opinion from an examining or treating physician on the question of Johnson's work-related limitations. The ALJ did not commit reversible error in failing to obtain such an opinion as substantial evidence on the record as a whole supports the assessment he made of Johnson's residual functional capacity.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Accordingly, Johnson's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 15th day of April, 2016.

_____
UNITED STATES MAGISTRATE JUDGE